**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

───────────────────────────────────

U.S. SECURITY HOLDINGS, INC.; U.S.
SECURITY ASSOCIATES HOLDINGS, INC.,

                 Plaintiffs,

    -against-

                                          No. 1:19-cv-8025 (CM)

RANDY ANDREWS,

                 Defendant

───────────────────────────────────

**MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS, DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND TRANSFERRING THIS CASE TO THE CENTRAL DISTRICT OF CALIFORNIA**

McMahon, C.J.:

Plaintiffs U.S. Security Holdings, Inc. and U.S. Security Associates Holdings, Inc. bring this breach-of-contract lawsuit against Defendant Randy Andrews, whom Plaintiffs allege has breached a provision of a stock purchase agreement that allegedly prohibits Randy from using the "ANDREWS" corporate name for personal or professional benefit. The contract also contains a forum-selection clause that vests jurisdiction in the state or federal courts located in New York City.

Plaintiffs have filed a motion for partial summary judgment on the issue of liability for the alleged breach, while Randy has filed a motion to dismiss based on the pleadings, arguing that the plain terms of the contract preclude him from being held personally liable for breach of the specific use-prohibition provision in question. Both of these motions must be denied – Randy's because the contract's plain terms clearly preclude him from using the ANDREWS name in connection

1

with another business venture, and Plaintiffs' because there remains a disputed issue of fact over whether Randy is actually doing so.

Randy also argues, albeit only in the alternative, that if this case is not dismissed it should be transferred to the Central District of California, where – months before this lawsuit was filed – Plaintiffs, through a subsidiary, commenced a trademark-infringement action that raises many of the same issues comprehended by this lawsuit and more. Ordinarily, a motion to transfer made so late in the day and in the face of a forum-selection clause would be summarily denied. However, this is one of those rare instances where the interests of justice would be better served by setting aside the parties' forum-selection clause in favor of judicial economy and uniformity of judgment – especially as it does not seem that the overlapping California case could have been brought in or transferred to New York.

Therefore, Defendant's motion to transfer this case to the Central District of California is granted.

## I.      BACKGROUND

### A. The Parties

U.S. Security Holdings, Inc. ("USH") and U.S. Security Associates Holdings, Inc. ("USAH") are both Delaware corporations formed and incorporated under Delaware law. Plaintiffs provide security guard services to organizations and individuals throughout the United States.

Defendant Randy Andrews ("Randy") is an individual who resides and is domiciled in California.

In 1988, Randy founded Andrews International, Inc. ("AI"), a security-guard services company that provided similar services as the Plaintiff entities. Randy served as the Chairman,

CEO, and President of AI for nearly thirty years, until Plaintiffs acquired AI – and its parent holding companies Andrews International Holdings, Inc. and Andrews Holdings Co. – pursuant to a stock purchase agreement ("SPA") executed on January 17, 2012. (ECF 1, Exh. C at ¶ 9). It is this agreement that the Plaintiffs accuse Randy of breaching.

Since Plaintiffs have alleged damages of over $75,000, this Court has diversity jurisdiction over this breach-of-contract claim pursuant to 28 U.S.C. § 1332(a).

**B. The Contract**

There were several parties to the SPA. Plaintiff USAH and USH (together as "Parent") to American Premier Security, Inc. (as "Buyer") agreed to purchase all of the stock of Andrews Holdings, Inc., a holding company that was the ultimate parent to several Andrews-named entities including Andrews International Holdings, LLC ("AIH") and AIH's wholly-owned subsidiaries AI, and Andrews International Government Services ("AIGS"). The contract designated AIH as the formal "Seller."

The SPA effectively transferred all of AIH's rights, property, and interests over to the U.S. Security entities. These included – among other things – all trademarks, copyrights, and internet domain names owned by the Andrews entities. (SPA § 4.11). For example, AIH owned the trademark to ANDREWS INTERNATIONAL, and also owned the domain names of several websites, including "andrewsinternational.com" and "Andrewsgovernmentservices.com." (ECF 20-2, at § 4.11).

At the time the SPA was executed, Randy was serving in various roles within the Andrews entities, including as the CEO of AIH, as a director of Andrews Holdings, and as CEO, director, president, and founder of AI. As a shareholder of AIH, Randy was personally paid $688,488.70 – denominated as part of the consideration paid to the "owners" of the "Seller" (ECF 20-19 at pg. 6)

– which he immediately rolled over into units of the newly-reorganized U.S. Security Associates. Randy personally signed the SPA as a "Rollover Seller," which allowed him to retain an economic interest in the new, post-merger U.S. Security entities.

After execution of the SPA, Randy transitioned his employment to U.S. Security Associates, Inc., a subsidiary of USH. It is undisputed that Randy served as U.S. Security Associates, Inc.'s Chief Security Officer, and also "remained the CEO and President of [AI]" pursuant to AI's new circumstances as a subsidiary of the U.S. Security entities. (ECF 1, Exh. C at ¶ 9).

The dispute over whether Randy is prohibited from using the Andrews name arises under one specific provision of the SPA, which states in full:[1]

> Effective as of the Closing Date, Buyer [American Premier Security, Inc.] hereby agrees, that Seller [Andrews International Holdings, LLC] may list the Company's name in a form mutually agreed with Company [Andrews Holdings Co.] (such agreement not to be unreasonably withheld, conditioned or delayed by the Company) on its printed materials and website and in other forms and media for the purpose of making truthful statements that Seller or its Affiliates (i) previously owned a controlling interest in the Company and its Subsidiaries and (ii) continue to own an indirect investment in the Company and its Subsidiaries. For the avoidance of doubt, nothing contained herein will waive or restrict or otherwise limit any rights that Audax [an investor in Andrews Holdings] or any of its Affiliates may have under applicable law or otherwise, including the right to use the Company name in a descriptive manner or for any nominative fair use or fair use. **Except as provided in this Section 11.18, none of the Seller, its parent entity or any of their Affiliates shall be entitled at any time ten days after the Closing Date to use the corporate name ANDREWS, used alone or in combination with any other word or design.** (SPA § 11.18) (emphasis added).

This clause supplemented and gave force to the transfer of the various "ANDREWS" trademarks from AIH to the U.S. Security entities.

---

[1] The Court has included the party definitions of Buyer, Seller, and Audax in brackets to better contextualize the provision.

The SPA defines an "Affiliate" as "any Person controlling, controlled by or under common control with such particular Person. For the purposes of this definition, 'controlling,' 'controlled' and 'control' means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise." (SPA § 10.01). Plaintiffs claim that Randy is personally liable to the obligations in the use-prohibition provision, either through his status as a "Rollover Seller" that signed the agreement, or otherwise as an "Affiliate" of the "Seller," AIH.

The contract also includes a routine forum-selection clause. It states, in relevant part, that:

> [T]he parties to this Agreement submit to the exclusive jurisdiction of the state courts located in New York, New York or the courts of the United States located in New York, New York in respect of the interpretation and enforcement of the provisions in this Agreement. (SPA § 11.14).

Plaintiffs thus insist that any dispute over the contract must be litigated in New York City.

## C. Plaintiffs' Allegations

Plaintiffs allege that, in violation of the use-prohibition provision of the SPA, Randy formed a competing security-services company in late 2017, Andrews Global Security. The record indicates that articles of organization were filed with the Secretary of State for California for "Andrews Global Security, LLC" on December 29, 2017. (ECF 21-8). On March 22, 2018, Andrews Global Security, LLC converted to Andrews Global Security, Inc. ("AGS"). (ECF 21-9). AGS has filed statements with the California Security of State identifying its corporate name as "Andrews Global Security, Inc." and describing its business as "security services." (ECF 21-10). AGS has also obtained a private patrol operator license from the California Bureau of Security and Investigative Services, and has also registered to do business with the City of Los Angeles. (ECF 21-12; 21-13).

Randy does not dispute the existence of AGS. Instead, he claims that he is not affiliated with the company; that it was formed by his son, Lee Andrews, who is not party to the sale of Randy's old company to Plaintiffs or to any of the agreements mentioned above. Randy avers, in a sworn declaration, that he himself has "never maintained an office at any [AGS] facility," has "never been an employee, shareholder, beneficial owner, officer of record or in fact, or a company director of AGS," nor has he ever "never received compensation from AGS" of any kind either from "profits or salary" or as a contract. (ECF 52 ¶ 4-5). He points out that AGS's incorporation and conversion documents all list his son, Lee, as the entity's incorporator and manager. However, AGS's website currently lists Randy as the company's CEO (ECF 21-19), and Plaintiffs have also submitted several business proposals submitted by AGS between late 2018 and early 2019 where Randy is identified as the company's CEO. (ECF 21-15; 21-16; 60-2). There thus appears to be a genuine issue of fact concerning the level of Randy's affiliation with the this new, California enterprise that employs the Andrews name in connection with a business that competes directly with Plaintiffs' businesses.

### D.  History of Litigation

On March 19, 2019, AIGS – a subsidiary of the U.S. Security Plaintiffs in this action – filed a lawsuit in the Central District of California against Randy, his son Lee, AGS, and, three other individuals associated with AGS (Don Anderson, George Casillas[2], and John Adams). The lawsuit alleges violations of the Lanham Act and California law for trademark infringement and unfair competition associated with the defendants' alleged use of the ANDREWS INTERNATIONAL trademark and several related marks. The complaint seeks damages and injunctive relief and specifically seeks an injunction prohibiting the defendants, including Randy,

---

[2] Plaintiffs later voluntarily dismissed defendant George Casillas from the case. *Andrews Int'l Gov't Servs., Inc. v. Andrews Glob. Sec., Inc. et al.*, No. 19-cv-2042 (C.D. Cal. 2019) (DSF) (ECF 51).

from using the Andrews trademarks. *See Andrews Int'l Gov't Servs., Inc. v. Andrews Glob. Sec., Inc. et al.*, No. 19-cv-2042 (C.D. Cal. 2019) (DSF).

The case was undoubtedly brought in California because AGS is a California corporation and the individual defendants are all residents of California. It is possible – indeed, it seems highly likely – that apart from Randy, none of the individual defendants could have been sued in New York, making California the only place where all defendants could be sued for the alleged infringement of the Andrews trademarks.

Four months after the California action was filed, on July 15, 2019, Plaintiffs filed this lawsuit in New York State Supreme Court against Randy alone, seeking damages against him for breaching the use-prohibition provision of the SPA that obliged him to refrain from using the ANDREWS name. As a practical matter, the damages sought against Randy in this action are effectively the same damages that are sought against him in California, since the ANDREWS name is part of the trademarks that were assigned to Plaintiffs in connection with the sale of the Andrews entities he used to own. Unsurprisingly, the complaint in this action alleges substantially the same facts as the California complaint, and in certain places, it contains the exact same language. *See, e.g.,* (ECF 1, Exh. A at ¶¶ 20, 23, 24, 26, 33, 34, 35, 36, 37; ECF 1, Exh. C at ¶¶ 29, 30, 31, 35, 39, 42, 43, 44, 45). However, while the facts alleged are the same, the theories of recovery differ: breach of contract here; trademark infringement and unfair competition in California.[3]

Randy timely removed the New York case to federal court on August 28, 2019. He did not, however, move to have this case transferred to the Central District of California, where it could have been immediately consolidated with the first-filed trademark action. Instead, the parties undertook discovery pursuant to their joint case management plan in this Court. Discovery closed

---

[3] The parties advise that there are also two cases pending in state courts in California, but they have no relevance to the outcome of these cross-motions.

on August 22, 2020. (ECF 30). The parties did the same in California; fact discovery there ended on February 21, 2020. This Court has been advised that the California federal trademark-infringement action is currently in mediation, with a final pretrial conference continued to February 14, 2022, and a trial date tentatively scheduled for March 2022. No trial date has been set in this Court.

The instant motions in this case were filed virtually simultaneously; Plaintiffs' filed their motion for partial summary judgment on August 3, 2020, and Randy filed his motion for judgment on the pleadings on August 6, 2020.

## II.     DISCUSSION

### A.  The Court Will Transfer the Case Only if it Cannot Dispose of it Summarily

Randy has moved to transfer this case to the Central District of California. The parties' SPA contains a forum-selection clause that vests "exclusive jurisdiction" in the state or federal courts located in New York City. (SPA §11.14). Such clauses are routinely honored, because they reflect what was "bargained for by the parties" and "protects their legitimate expectations and furthers vital interests of the justice system." *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for the Western Dist. of Tx.*, 571 U.S. 49, 63 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)).

However, there are instances when slavish adherence to a forum-selection clause makes no sense. This case, where overlapping litigation is taking place in another jurisdiction – presumably the only jurisdiction where all relevant parties can be sued – may well present one of them.

I have, therefore, concluded that the proper course is for me to see first whether I can dispose of this case summarily, by granting either Plaintiffs' motion for partial summary judgment or Randy's motion for judgment on the pleadings. If I can, I should do so, to honor the forum-

selection clause in the parties' contract. However, if I cannot do so, then I shall consider whether to enforce the forum-selection clause, with the understanding that parallel litigation is taking place elsewhere and that a trial may be necessary in both proceedings.

### B. Randy's Motion for Judgment on the Pleadings is Denied

Randy asserts several meritless arguments in support of his motion for a judgment on the pleadings. For example, he argues that the contract forbids Plaintiffs from suing for breach – citing several provisions that clearly pertain only to indemnification for "a breach of any representation or warranty" made "*prior to Closing*." (SPA §9.02(a); § 9.02(b)). None of the provisions Randy cites discusses the waiver of a right to sue based on post-closing breaches. A contract should not be interpreted in a way that precludes a party from suing to enforce its terms. In the absence of a clear waiver of the right to sue – which does not exist – I will not so interpret the contract.

Randy also argues that the case should be dismissed because the Plaintiffs failed to join several indispensable parties – namely AIGS, AI, or American Premier Security (the "Buyer" in the contract) under Rule 19. But the absent parties are not indispensable to the adjudication of this breach-of-contract suit. The record demonstrates that Plaintiff U.S. Security Holdings, Inc. is a direct successor-in-interest to any and all interests held by American Premier Security, as the two merged effective December 29, 2015. (ECF 20-7). "Once a corporation has been merged out of existence, its rights, privileges, and very identity are merged into the remaining corporation." *Basch v. Talley Indus., Inc.*, 53 F.R.D. 9, 11 (S.D.N.Y. 1971).

AIGS and AI – following the execution of the SPA – are now wholly-owned subsidiaries of the U.S. Security Plaintiffs. Randy asserts that these two Andrews entities are indispensable to the suit because – as the original holders of the ANDREWS trademarks – their interests in the marks may be affected if they are not joined. But whatever interest these entities have in this

*breach-of-contract suit* (as opposed to the California trademark suit) are fully represented by their parent companies. Dismissal for failure to join an indispensable party "is concerned only with those who are already parties," *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006), and a party is considered necessary only if a court cannot "accord complete relief *among existing parties*." Fed. R. Civ. P. 19(a) (emphasis added). There is no reason why complete relief cannot be accorded between the current Plaintiffs and Randy Andrews as to the Plaintiffs' breach-of-contract claim. Therefore, the Court will not entertain Randy's motion to dismiss on this basis. Indeed, the fact that AIGS is currently the lead plaintiff in the trademark-infringement suit militates in favor of transferring this case so that any concerns that Randy may have had about its lack of involvement in this suit would be alleviated if this case were consolidated with the trademark case.

Randy's principal argument is that he is not bound by the use-prohibition provision in Section 11 of the SPA, because he signed that contract only in his capacity as a "Rollover Seller." This argument, too, is meritless.

Section 11 provides clearly that "none of the Seller, its parent entity *or any of their Affiliates* shall be entitled at any time ten days after the Closing Date to use the corporate name ANDREWS, used alone or in combination with any other word or design." (SPA § 11.18) (emphasis added). The contract defines an "Affiliate" as "any Person controlling, controlled by or under common control with such particular Person. For the purposes of this definition, 'controlling,' 'controlled' and 'control' means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise." (SPA § 10.01).

Under New York law, where the terms of a contract are "clear, unequivocal and unambiguous," interpretation of the contract presents a question of law for the court, and "the contract is to be interpreted by its own language." *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y. 2d 29, 32 (2002) (quoting *Springsteen v. Samson*, 32 N.Y. 703, 706 (1865)). In this case there is no ambiguity; Randy clearly qualifies as an "Affiliate" of the Seller, AIH, or as an Affiliate of any of AIH's parent entities. At the time of the SPA, Randy served in several roles within the Andrews entities, including as the manager and CEO of AIH; as the CEO and director of AI; and as a director of Andrews Holdings Co. and Andrews International Security Services (another subsidiary). (ECF 20-3). He clearly had "the power to direct the management and policies of [the selling entities]." (SPA § 10.01). Randy was also a major shareholder of the selling entities, as evidenced by the fact that he was compensated more than any other individual in connection with the sale of the Andrews entities (ECF 20-19, at pg. 6), and allowed to roll over his financial interest in the selling entities into an interest in the purchasers. He is thus clearly an "Affiliate" of the Andrews entities that were prohibited from using the ANDREWS name after closing. Indeed, it would make no sense if Randy were not so bound, since he is *Mr. Andrews* and it is his name whose use was being prohibited.

In short, the language of the contract is unambiguous, and no reasonable person could conclude that Randy was not an "Affiliate" of the sellers who was bound by the SPA. *See Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985),

Randy's signature in his capacity as a "Rollover Seller" also manifests "an intent to be bound by the contract." *See, e.g., Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S. 2d 632, 633 (1st Dep't. 1997). By signing the contract, he obtained the right to be compensated – handsomely so – for the sale of the companies with which he was affiliated, as well as a personal financial interest in the surviving entity and employment with the ongoing business. There is

absolutely no doubt that he is personally bound by the terms of the contract as a matter of New York law, which controls the interpretation of this contract.

I thus conclude that Randy Andrews is not permitted to use the ANDREWS name other than in a form "mutually agreeable" to the Plaintiffs "for the purpose of making truthful statements that Seller or its Affiliates (i) previously owned a controlling interest in the Company and its Subsidiaries and (ii) continue to own an indirect investment in the Company and its Subsidiaries." (SPA § 11.18). If he is using the name for any other business purpose, then he can be sued for breach of his agreement not to use the name.

For this reason, Randy's motion for judgment on the pleadings is DENIED.

## C. Disputes of Fact Remain as to Whether Randy Impermissibly "Used" the ANDREWS Name

Unfortunately for Plaintiffs, I also cannot grant their motion for partial summary judgment on liability, because there remains a disputed issue of fact concerning whether Randy is making use of the Andrews name in connection with another business venture.

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact" and a party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A party moving for summary judgment bears the burden of demonstrating the absence of any dispute over a material fact, and its claims will be viewed in the light most favorable to the nonmovant. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Under New York law, a party claiming breach of contract must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir.2000) (quoting *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998)).

12

Here, the only element that remains in dispute is whether Randy breached the contract; and the only issue relevant to that determination is whether Randy impermissibly "used" the ANDREWS name in violation of the contract. Randy has averred, in a sworn declaration subject to the penalty of perjury, that he is "retired," and has "never maintained an office at any Andrews Global Security facility," and that he has never "been an employee, shareholder, beneficial owner, officer of record or in fact, or a company director of AGS." (ECF 52 at ¶ 4). He also swears that he has never "received compensation from AGS . . . in cash or in kind" nor has he "become a party to any agreement with AGS or any related entity by which [he was] to obtain future compensation from AGS or any related entity." Finally, he avers that he "did not form AGS" nor has he ever been a "contractor" with the company, nor received any "profits or salary." (*Id*. at ¶ 5).

Some evidence in the record before this court supports Randy's affidavit. For example, the documents incorporating Andrews Global Security, LLC all list Randy's son, Lee, as the entity's "Organizer" and "Agent." (ECF 21-8). Lee Andrews was also listed as Andrews Global Security, LLC's "Member/Manager" and as "Incorporator" when the LLC converted into a regular corporation, Andrews Global Security, Inc., on March 22, 2018. (ECF 21-9). In subsequent forms AGS filed with the California Secretary of State – one each on April 22, 2018 and November 5, 2018 – Lee Andrews is listed as the company's CEO, Secretary, CFO, and sole director. (ECF 21-10; 21-11). AGS's private patrol operator license from the state of California – first issued July 23, 2018 – also lists Lee Andrews as AGS's CEO, CFO and Secretary; with another individual – John Adams – listed as AGS's manager. (ECF 51-5). Randy's name does not appear at all on any of these documents.

But there is other evidence tending to suggest that this is not the case. The record contains an email dated October 26, 2018, signed by Randy, letting someone know that "I have started a

new company AndrewsGlobal" (ECF 21-4), as well as several business proposals submitted by

AGS from late 2018 to early 2019 that list "Randy L. Andrews" as AGS's "CEO." (ECF 21-15;

21-16; 60-2). Another email from Lee Andrews, dated April 9, 2018, states that "My dad [Randy]

said he spoke with you about the new security company *we* are starting, AGS (Andrews Global

Security, Inc.)." (ECF 20-11) (emphasis added). Finally, and most disturbingly, AGS's website

currently lists Randy as its CEO. (ECF 21-19).

This conflicting evidence means that there exists a triable issue of fact: did Randy "use"

the ANDREWS name in violation of his contractual obligation not to do so, or was the Andrews

name used solely by persons who are not party to the SPA.

For that reason, Plaintiffs' motion for partial summary judgment on liability is also

DENIED.

### D.  Because This Lawsuit Substantially Overlaps with the California Action, Randy's Motion for Transfer is Granted.

Since I cannot dispose of this lawsuit summarily, I turn to Randy's motion in the alternative

for a transfer to the Central District of California. While this Court is not pleased that no such

motion was made until the close of discovery and the filing of dispositive motions, I conclude that

there is every reason to grant the motion, and that the existence of a forum-selection clause does

not bar my doing so.

Forum-selection clauses are ordinarily enforced according to their terms. But the existence

of such a clause in a contract does not mean that a court in the preselected forum can never transfer

a case brought under that contract to another court. Although such clauses limit courts' discretion,

a court faced with a transfer motion must still analyze whether transfer would be appropriate under

28 U.S.C. § 1404's transfer analysis – albeit with certain adjustments. *See Atlantic Marine*, 571

U.S. at 63 (noting that "The presence of a valid forum-selection clause requires district courts to

adjust their usual § 1404(a) analysis"). Judicial economy and the risk of inconsistent judgments do not cease to be pertinent considerations just because a contract contains a forum-selection clause.

Courts considering whether to transfer a case generally undertake a two-step inquiry. "First, the court must determine whether the action sought to be transferred is one that might have been brought in the transferee court. Second, the court must evaluate . . . several factors relating to the convenience of transfer and the interests of justice." *Encompass Aviation, LLC v. Surf Air Inc.*, No. 18-cv-5530 (CM), 2018 WL 6713138, at *5 (S.D.N.Y. Nov. 30, 2018) (quoting *Flood v. Carlson Restaurants Inc.*, 94 F. Supp. 3d 572, 576 (S.D.N.Y. 2015)).

The parties do not contest that the case could have been brought in the Central District of California; that that court would have personal jurisdiction over both parties. As noted above, it does not appear that the California case, to which all the relevant players are party, could have been brought in New York. All the defendants in that action are Californians, and as far as this Court is aware, only Randy has consented to jurisdiction in New York.

When considering whether transfer is warranted either because of convenience or the interests of justice (the second step) courts generally evaluate a number of factors including, *inter alia*, "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106–07 (2d Cir. 2006). That "calculus changes" when there is a valid forum-selection clause, *Atlantic Marine*, 571 U.S. at 63, because, by inserting such a clause into their contact, the parties essentially "waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses or for their pursuit of the litigation." *Id*. at 64. In effect, this

15

means that all private-interest considerations "weigh entirely in favor of the preselected forum" and a court "may consider arguments about public-interest factors only." *Ibid*.

However, a court can still decide to transfer a case if the public-interest factors weigh heavily in favor of transfer, or if enforcement of the clause would otherwise be wholly "'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). Public-interest considerations include, *inter alia*, "administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Atlantic Marine*, 571 U.S. at 63 n.6. Other considerations include "the enforceability of the judgment" and "practical considerations that could make trial easy, expeditious, or inexpensive" *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995) as well as "systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 (6th Cir. 2006) (quoting *Moses v. Bus. Card Exp., Inc.* 929 F.2d 1131, 1137 (6th Cir. 1991)).

The case before this Court is substantially similar to the one filed in California. The two cases allege the same wrongful use of the ANDREWS name in connection with a new security business in California. Insofar as Randy is concerned, the plaintiffs in both actions (which are all U.S. Security entities) are seeking damages for the same alleged conduct; conduct that Randy denies. The only difference in the suits is the separate theories of recovery plaintiffs are pursuing in the different courts.

But if Randy is in fact using the ANDREWS name in connection with a newly-formed security business in California, then he is both breaching his agreement not to use the name except in specified circumstances *and* likely infringing trademarks that he sold to the U.S. Security entities. In both cases, a court will have to determine (1) who owns the ANDREWS trademarks

16

(something that appears to be undisputed); (2) whether Randy is barred from using that trademark, which also happens to be his name (something that also cannot be disputed, *see* Section II.B, *supra*); and (3) whether Randy has actually been using the Andrews names and the trademarks associated therewith (a fact that, as we have seen, is very much in dispute). And if Randy is found to have used the ANDREWS name improperly, both courts will also have to determine, "The extent of . . . Defendants' profits generated from use of the Andrews Marks," which will be relevant to the amount of damages that can be assessed against Randy. *See Andrews Int'l Gov't Servs., Inc. v. Andrews Glob. Sec., Inc. et al.*, No. 19-cv-2042 (C.D. Cal. 2019) (DSF) (ECF 31, pg. 5).

Plaintiffs cannot recover double damages against Randy for the same conduct – use of the ANDREWS name – by dint of filing two lawsuits in separate courts. The fact that there is no claim for injunctive relief in the New York case is of no moment.

The overlap between the trademark and breach-of-contract cases in circumstances like these was the subject of a recent Second Circuit decision. In *Horowitz v. 148 S. Emerson Assocs. LLC*, 888 F.3d 13, 23 (2d Cir. 2018), the Court of Appeals held that a trademark-infringement action and a breach-of-contract claim, both of which concerned the use of the same words and arising out of the same nucleus of operative facts, were essentially "the same claim" that should be tried in the same court if possible. Resolution of both cases required a trial court to consider the "same core showing" about "legal ownership" of the trademark and whether or not the use of the trademark was impermissible. *Ibid*. The court concluded that if the defendant in the action owned the trademarks in question – as it claimed – then it was likely that it "neither breached the License Agreement . . . nor violated the Lanham Act." But, "On the other hand, if [plaintiff] owns the marks or if [defendant] had no right to their use, [defendant] may have breached the License

Agreement or violated the Lanham Act." *Ibid*. At bottom, the assertions in the actions were based on "the same underlying claims of ownership and use rights." *Ibid*.

So too here. In both this case and the California case, a trial court will need to determine whether Randy impermissibly "used" the ANDREWS name in violation of the SPA and federal trademark law. Two courts should not be trying the contract and trademark issues separately, because, if Randy is in breach of the contract, he is also likely (almost certainly) violating the Plaintiffs' rights in the trademarks for whose sale he was handsomely compensated. The public interest militates in favor of consolidating these actions if only to avoid inconsistent results; and it makes no sense for all issues but one to be resolved in California, and to leave one single issue hanging for resolution in New York.

In this instance, there must be a trial in California, because that is the only place where all the defendants in the trademark-infringement/unfair-competition action can be sued. That being so, the forum-selection clause must take a back seat to judicial economy and guarding against the possibility of inconsistent results. Indeed, if slavish deference to the forum-selection clause were required, this Court would stay the New York case until the California case was resolved, in order to minimize the chance of inconsistent verdicts. That is not necessary when this case can be transferred to California and be consolidated with the case that is already there.

A second public policy consideration is also at work here. In accordance with the first-filed rule, "Where there are two competing lawsuits" that involve substantially the same issues and parties, "the first suit should have priority." *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989); *see also Internet Law Library, Inc. v. Southridge Cap. Mgmt., LLC*, 208 F.R.D. 59, 64 (S.D.N.Y. 2002). The rule is designed to "avoid duplication of judicial effort, avoid vexatious litigation in multiple forums, achieve comprehensive disposition of litigation

among parties over related issues, and eliminate the risk of inconsistent adjudication." *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 539 (S.D.N.Y. 2013) (quoting *Marshak v. Reed*, No. 96-cv-2292 (NG) (MLO), 2000 WL 33152076, at * 2 (E.D.N.Y. Oct. 17, 2000)).

This case was filed four months after the California case was filed. The first-filed doctrine exists specifically for this situation, to "protect[] parties from the considerable expense and potential for inconsistent judgments that duplicate litigation entails." *Kellen Co., Inc. v. Calphalon Corp.*, 54 F. Supp. 2d 218, 221 (S.D.N.Y. 1999).  It is meant "to foster judicial economy and 'the comprehensive disposition of litigation'" and "to protect parties from 'the vexation of concurrent litigation over the same subject matter.'" *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) (citations omitted).

While few courts have had to consider whether the first-filed doctrine trumps a forum-selection clause, some courts confronted with the question have concluded that forum-selection clauses  should not be enforced where dividing suits that arose from the same operative facts would "be wasteful and inefficient." *See, e.g., Enhancedcare, Inc. v. Attentive Health & Wellness, LLC*, No. 20-cv-6171 (FPG), 2021 WL 388763, at *8 (W.D.N.Y. Feb. 4, 2021) (quoting *Jones v. Custom Truck & Equip., LLC*, No. 10-cv-611, 2011 WL 250997, at *5-6 (E.D. Va. Jan. 25, 2011)).

By contrast, cases in which courts have favored forum-selection clauses over first-filed cases are, for the most part, cases in which the first-filed case was an obvious effort to evade an otherwise valid forum-selection clause – i.e., cases in which the defendant in the first-filed case was attempting to enforce the clause against the plaintiff. *See, e.g., Univ. Operations Risk Mgmt., LLC v. Global Rescue LLC*, 2012 WL 2792444, at *6 (N.D. Cal. 2012); *cf Kellen Co.*, 54 F. Supp. 2d at 221 (observing that most considerations of forum shopping in first-filed cases "present scenarios in which the plaintiff in the first action is the defendant in the second action"). There is

no such concern in this case. Here, it is the Defendant who seeks to have this case transferred to the forum in which Plaintiffs chose to file the first lawsuit arising out of the same operative factual nucleus. Nor is this a case in which the plaintiffs sued elsewhere in an effort to avoid the forum-selection clause; Plaintiffs appear to have sued in California because that is the place where all defendants relevant to the trademark-infringement/unfair-competition case are located. Far from trying to avoid the forum-selection clause, the fact that Plaintiffs brought a second lawsuit in New York – rather than consolidating their claims against Randy in a single court – indicates that they deferred to the forum-selection clause. But it makes no sense for this Court to do so.

Accordingly, this case is transferred to the Central District of California, where I have no doubt that my colleague Judge Fischer will consolidate it with the pending trademark-infringement and Lanham Act case – thereby resolving all the issues arising out of the founding of Andrews Global Security in California.

**CONCLUSION**

For the reasons set forth above, Randy's motion to dismiss is denied, Plaintiffs' motion for partial summary judgment is denied, and the case is transferred to the Central District of California pursuant to 28 U.S.C. § 1404.

The Clerk of the Court is respectfully directed to remove the motions at Dkt. Nos. 19, 24, 59, 63, and 68 from the Court's list of pending motions, and to transfer this case to the Central District of California, whereupon it shall be removed from the docket of this court.

Dated: March 2, 2021

_____
Chief Judge

BY ECF TO ALL COUNSEL

20
